**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EDGAR GUIMARAES and** | : | No. 3:24cv1232 |
| **ALEXANDER DURAN,** | : | |
| **on behalf of themselves and all other** | : | (Judge Munley) |
| **similarly situated persons,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **METAL TRANSPORT, LLC** | : | |
| **(individually and d/b/a CENTURY** | : | |
| **EXPRESS); EVANS DELIVERY** | : | |
| **COMPANY, INC. (individually and** | : | |
| **d/b/a CENTURY EXPRESS);** | : | |
| **CENTURY EXPRESS; ABC CORPS.** | : | |
| **1-10 (fictitious parties) and** | : | |
| **JOHN/JANE DOES 1-10 (fictitious** | : | |
| **parties),** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### <u>MEMORANDUM</u>

Plaintiffs Edgar Guimaraes and Alexander Duran signed owner-operator

agreements with a motor carrier and worked as truck drivers.  As discussed

below, the agreements called for the plaintiffs to be paid a percentage of the

revenue from each load transported subject to chargebacks and other deductions

by the defendants.  In this action, plaintiffs assert claims on behalf of themselves

and other similarly situated individuals against Defendants Metal Transport, LLC

(individually and d/b/a Century Express) ("Metal"); Evans Delivery Company, Inc.

(individually and d/b/a Century Express) ("Evans"); and Century Express alleging

that, despite the agreements, they were employees and not independent contractors.[1]

As citizens of New Jersey, plaintiffs advance claims pursuant to the New Jersey Wage Payment Law ("NJWPL"), N.J. STAT. ANN. §§ 34:11-4.1–4.14, for allegedly unlawful withholdings and deductions from their wages as the result of this purported misclassification.  Plaintiffs also contend that defendants failed to pay them overtime in violation of the New Jersey Wage and Hour Law ("NJWHL"), N.J. STAT. ANN. § 34:11-56a.

Before the court are two motions to dismiss plaintiff's third amended complaint filed by Defendants Evans and Metal pursuant to Federal Rule of Civil Procedure 12(b)(6).  Having been fully briefed, these motions are ripe for disposition.

**Background**

According to the third amended complaint, Defendants Evans and Metal provide transportation and delivery services from various seaports in New Jersey, including the Port Newark Container Terminal.[2]  (Doc. 81 ¶¶ 8, 10).

---

[1] As alleged, both Evans and Metal conduct business in New Jersey using "Century Express" as a trade name. (Doc. 81 ¶¶ 5–6).  Per the third amended complaint, Century Express describes itself on its website as an intermodal trucking company based in Newark, New Jersey and as a division of Defendant Evans. Id. ¶ 7.

[2] These brief background facts are derived from plaintiffs' third amended complaint and the exhibits attached to the parties' briefs as further discussed in footnote 4.  At this stage of the proceedings, the court must accept all factual allegations in the amended complaint as true.

Guimaraes and Duran contracted with defendants as owner-operators, hauling intermodal containers filled with various products to and from defendants' facilities to their customers along delivery routes set by the defendants. Id. ¶¶ 2–4, 7, 12, 20.   Guimaraes hauled loads for the defendants between 2016 (or 2017) and 2019. Id. ¶¶ 2, 25.  Duran operated vehicles in furtherance of the defendants' business between 2018 and 2023. Id. ¶ 3.

Per the allegations, the owner-operator agreements between the plaintiffs and defendants caused plaintiffs to be misclassified as independent contractors and not employees when an employer-employee relationship existed between the parties. Id. ¶¶ 1, 9, 12, 17.  Thus, plaintiffs advance facts focusing on the level of control that defendants allegedly exercised over their truck drivers.  For example, plaintiffs allege the following: they did not work in an independently established trade, occupation, profession, or business; they did not have their own clientele; they relied exclusively upon defendants for work; and they joined the ranks of the unemployed upon their termination. Id. ¶¶ 21–23.

As other examples of alleged control, Guimaraes leased a truck tractor, a 2015 International Prostar, through defendants' lease-to-buy program. Id. ¶ 26.  Pursuant to that program, Guimaraes then had to lease the use of the tractor

---

Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  The court makes no determination, however, as to the ultimate veracity of these assertions.

exclusively to Defendant Evans so that it could only be used in the course of defendants' business. Id.  When Guimaraes's tractor went out of service, defendants provided him with a rental vehicle as a replacement so he could continue to drive for them. Id. ¶ 27.  Similarly, Duran leased a 2012 Mack truck through a vehicle financing company. Id. ¶ 29.  Duran then had to lease the use of that truck exclusively to Defendant Evans. Id.  Plaintiffs allege that the defendants' lease-to-buy program was used by defendants to support the misclassification of the plaintiffs as independent contractors.  Id. ¶ 30.

Plaintiffs also allege that deductions were taken from their wages for the following: 1) bobtail insurance; 2) escrow; 3) fuel; 4) fuel cards; 5) oil; 6) road tax fees; 7) maintenance escrows; 8) occupational accident insurance; 9) physical damage insurance; 9) per diem/maintenance and repair; 10) a tire liability program; 11) license plate fees; and 12) driver log deductions.[3] Id. ¶¶ 34a–34n.

---

[3] The third amended complaint further alleges that defendants exercised significant control over the plaintiffs and putative class members in other ways, including: 1) providing plaintiffs their daily work and delivery documents through defendants' dispatchers at defendants' facilities; 2) determining plaintiffs' arrival times at work and their delivery times, including designating priority "hot loads" that needed to be rushed to their destinations; 3) requiring that plaintiffs store their tractors at defendants' facilities where they would be picked up and dropped off at the start and end of each work day; 4) requiring that plaintiffs complete specific invoices identifying defendants' place of business; 5) requiring plaintiffs to complete and return time verification reports; 6) holding safety meetings conducted by Defendant Evans's personnel and requiring plaintiffs to attend; 7) providing plaintiffs with rental or replacement vehicles to perform delivery work for the defendants; 8) providing the intermodal chassis which were used to haul shipping containers in performance of delivery work; 9) requiring plaintiffs to display placards on their trucks indicating that the trucks were being used by "Century Express, Operated by Evans Delivery Company"; and 10) requiring plaintiffs to use electronic logging systems provided by defendants to record their driving and work time. Id. ¶¶ 18a–18o.

Plaintiffs further contend that the lease-to-buy program was used as a basis to deduct numerous categories of fees and payments from plaintiffs' wages in violation of New Jersey law. Id. ¶ 30.

Plaintiffs further allege that they regularly worked in excess of 40 hours per week at the instruction of the defendants but were not paid overtime wages. Id. ¶¶ 35–37. Per plaintiffs, defendants never compensated them using an overtime rate of pay as required under New Jersey law. Id.

Based on the above allegations made on behalf of the plaintiffs and the putative class members, Count I asserts violations of the NJWPL regarding the allegedly unlawful deductions discussed above. Id. ¶¶ 47–51. Count II claims that defendants violated the NJWHL by failing to compensate workers with overtime wages for all hours worked in excess of 40 hours. Id. ¶¶ 52–54. Count II is asserted on behalf of Duran and the putative class only, not Guimaraes. Id. In response to the third amended complaint, Defendants Evans and Metal each filed motions to dismiss pursuant to Rule 12(b)(6). (Docs. 83, 85).

**Jurisdiction**

Plaintiffs seek to certify this action as a class action pursuant to Federal Rule of Civil Procedure 23. (Doc. 81, Third Am. Compl. ¶ 38). The Class Action Fairness Act ("CAFA") provides district courts with original jurisdiction of any civil action that is a class action subject to certain requirements: "(1) an amount in

5

controversy that exceeds $5,000,000, as aggregated across all individual claims; (2) minimally diverse parties; and (3) that the class consist of at least 100 or more members." Judon v. Travelers Prop. Cas. Co. of Am., 773 F.3d 495, 500 (3d Cir. 2014)(citing 28 U.S.C. §§ 1332(d)(2), (5)(B), (6); Standard Fire Ins. Co. v. Knowles, 568 U.S. 588, 590 (2013)).

CAFA jurisdiction is limited to cases where the proposed class has more than 100 members. Id. at 505 (citing 28 U.S.C. § 1332(d)(5)(B)).   In this case, the proposed class includes "[a]ll individuals that contracted with Defendants as 'owner-operators' or who otherwise provided truck driving services for Defendants and who provided said truck driving services in the State of New Jersey from July 2017 through to the present..." (Doc. 81, Third Am. Compl. ¶ 12).  In its notice of removal, Defendant Evans indicates that "it is one of the largest intermodal drayage providers in the United States," and that it has contracted with thousands of truck drivers. (Doc. 1 ¶¶ 10, 24).  Thus, the proposed class exceeds 100 individuals.

Regarding diversity of citizenship, CAFA allows for minimal diversity, that is, jurisdiction is afforded where any member of a class of plaintiffs is a citizen of one state and any defendant is a citizen of a different state. See 28 U.S.C. 1332(d)(2)(A).  As alleged and fairly construed, both named plaintiffs are citizens of New Jersey and Defendant Evans is a corporation organized under the laws of

the Commonwealth of Pennsylvania. (Doc. 1, Notice of Removal ¶¶ 17–18; Doc. 81, Third Am. Compl. at ¶¶ 2–3, 6). CAFA's diversity requirement is thus met here.

As for the amount in controversy, plaintiffs allege that various operating expenses were unlawfully deducted from their wages, including for insurance, fuel, taxes, and other vehicle-related costs in violation of the NJWPL. (Doc. 81, Third Am. Compl. ¶¶ 33–34). Furthermore, plaintiffs allege that they were not paid overtime wages by defendants in violation of the NJWHL. Id. ¶¶ 35–37. Both the NJWPL and NJWHL provide for liquidated damages and recovery of attorneys' fees. N.J. STAT. ANN. § 34:11-4.10(c); N.J. STAT. ANN. § 34:11-56a25. Given the types of allegedly unlawful wage deductions relative to operating tractor trailers, the alleged overtime violations, the size of the putative class, and the possibility of liquidated damages and attorneys' fees under New Jersey law, the amount in controversy exceeds $5,000,000, when the claims of the individual proposed class members are aggregated. See Frederico v. Home Depot, 507 F.3d 188, 199 (3d Cir. 2007).

All of plaintiffs' claims arise under state law. As a federal court sitting in diversity, the substantive law of New Jersey shall apply to the instant case. See Sheridan v. NGK Metals Corp., 609 F.3d 239, 250, n. 12 (3d Cir. 2010); Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. Co.

v. Tompkins, 304 U.S. 64, 78 (1938)).  As for the reasons why this federal district

court in Pennsylvania has been called upon to resolve this dispute arising under

New Jersey law, plaintiffs' third amended complaint references agreements

between plaintiffs and defendants which include forum selection clauses. (Doc.

81, Third Am. Compl. ¶ 32).  Those agreements are not attached to the plaintiffs'

operative pleading.  Nonetheless, Defendant Evans attached those agreements

to its brief in support, (Docs. 84-1, 84-2), plaintiff attached exhibits to the

agreements in its brief in opposition, (Docs. 87-1, 87-2), and the court may

properly consider these documents here.[4]

The agreements indicate that:

> any claim or dispute arising from or in relationship between
> the parties, whether under federal, state, local, or foreign
> law (including but not limited to 49 C.F.R. Part 376), shall

---

[4] Courts may "generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record" when deciding a motion to dismiss. Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted).  A court may also properly consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." (Id.) (citations omitted). Additionally, "a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (cleaned up) (emphasis in original).  The rationale for the "integral documents exception" is that "it is not unfair to hold a plaintiff accountable for the contents of documents it must have used in framing its complaint[.]" Schmidt v. Skolas, 770 F.3d 241, 250 (3d Cir. 2014) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426)  "[N]or should a plaintiff be able to evade accountability for such documents simply by not attaching them to his complaint." Id.  The critical component "is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited[,]" and a plaintiff "cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426 (citations omitted).

>        be litigated in the state or federal courts serving Schuylkill
>        Haven, Pennsylvania.    For that purpose, carrier and
>        contractor hereby agree to submit to the venue and
>        jurisdiction of such courts.

(Doc. 84-1 at ECF p. 12 (Duran Agreement); Doc. 84-2 at ECF p. 12 (Guimaraes Agreement) (capitalization removed)).

Schuylkill Haven, Pennsylvania is located within the Middle District of Pennsylvania, where Defendant Evans maintains its principal place of business. (Doc. 1, Notice of Removal ¶ 18).  Irrespective of these agreements, venue is appropriate in this district pursuant to the statute. See 28 U.S.C. § 1391(b)(3), (c)(2).

**Standard of Review**

Defendant Evans and Defendant Metal have filed motions to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  The court tests the sufficiency of the complaint's allegations when considering a Rule 12(b)(6) motion.

To survive a motion to dismiss, "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " Doe v. Princeton Univ., 30 F.4th 335, 341–42 (3d Cir. 2022) (quoting FED. R. CIV. P. 8(a)(2)).  That means, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544,

570 (2007)).  A claim has facial plausibility when factual content is pled that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. (citing Twombly, 550 U.S. at 570).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555).

On a motion to dismiss for failure to state a claim, district courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. See Phillips, 515 F.3d at 233 (citations omitted).

**Analysis**

Plaintiffs third amended complaint alleges violations of the NJWPL by the defendants.  The NJWPL "governs the time and mode of payment of wages due to employees." Hargrove v. Sleepy's, LLC, 106 A.3d 449, 457 (N.J. 2015). Under this statute, " '[n]o employer may withhold or divert any portion of an employee's wages unless…[t]he employer is required…to do so by New Jersey or United States law…or [t]he amounts withheld or diverted' are for contributions, payments, fees, or deductions authorized by the employee and approved by the employer." Maia v. IEW Constr. Grp., 313 A.3d 887, 895 (N.J. 2024) (citing N.J. STAT. ANN. 34:11-4.4).

Plaintiffs also allege that defendants violated the NJWHL.  The NJWHL protects employees from unfair wages and excessive hours. Id. at 896 (citations omitted).  "For certain employers," this statute, "imposes an overtime rate for each hour of work in excess of the forty-hour work week." Id. (citing N.J. STAT. ANN. 34:11-56a4).

In 2019, the New Jersey legislature amended both the NJWPL and NJWHL through Chapter 212.[5] Id. at 891 (citing P.L. 2019, ch. 212).  As discussed in Maia, Chapter 212 added substantive rights to the NJWPL and NJWHL including new causes of action, defenses, and damages, and extended the statute of limitations for NJWHL claims from two years to six years. Id. at 891, 900.  Maia concluded that the new six-year statute of limitations for NJWHL claims was to be applied prospectively, not retroactively. Id. at 900.

The New Jersey legislature, however, failed to include language about the limitations period for claims brought under the NJWPL. Id. at 897, n. 3.  Thus, even with the amendments in Chapter 212, the NJWPL does not contain an explicit statute of limitations, and the applicable limitations period has not yet been conclusively determined by the New Jersey courts.[6]

---

[5] This legislation is also known as the New Jersey Wage Theft Act. See Morales v. Aqua Pazza LLC, No. CV 20-6690, 2022 WL 1718050, at *4 (D.N.J. May 27, 2022).

[6] Dicta in Maia indicates that that the new six-year statute of limitations for NJWHL claims "has no bearing on the limitations period for the [NJWPL]." 313 A.3d at 897, n. 3.  In another

### 1. Statute of Limitations

This gap in the law brings the court to the first issue raised in the defendants' motions to dismiss. Moving defendants argue that the plaintiffs' NJWPL claims are barred, in whole or in part, by a two-year statute of limitations, which applies to penal statutes under other state statutory provisions. Plaintiffs counter that a six-year statute of limitations applies here.

As indicated above, no reported New Jersey decision controls this determination. Thus, it is the duty of this court to predict how the Supreme Court of New Jersey would rule if presented with this case. See Nationwide Mut. Ins. Co. v. Buffetta, 230 F.3d 634, 637 (3d Cir. 2000) (citations omitted). Accordingly, the court must predict whether the Supreme Court of New Jersey would conclude that the NJWPL is penal in nature and apply a two-year limitations period, whether that court would apply a six-year limitations period, or whether it would apply some other statute of limitations to the plaintiffs' claims. In making that prediction, the decisions of intermediate New Jersey appellate courts receive significant weight in the absence of an indication that the highest state court would rule otherwise. See SodexoMAGIC, LLC v. Drexel Univ., 24 F.4th 183, 204 (3d Cir. 2022) (citations and quotation marks omitted).

---

footnote, the Supreme Court of New Jersey also made clear that its holding in Maia did not reach the issue of the NJWPL limitations period. Id. at 900, n. 5.

The court begins by addressing defendants' reasoning.  New Jersey law provides a two-year limitations period for "[a]ll actions at law brought for any forfeiture upon any penal statute made or to be made…when the benefit of the forfeiture and the action therefor is or shall be limited or given to the party aggrieved[.]" N.J. STAT. ANN. 2A:14-10(b) ("Section 2A:14-10").  For Section 2A:14–10 to apply, it must first be shown that the claims are brought pursuant to a penal statute. State, Dep't of Env't Prot. v. Larchmont Farms, Inc., 628 A.2d 761, 770 (N.J. Super. Ct. App. Div. 1993) ("Larchmont Farms").  Under New Jersey law, a penal statute has been defined as one which imposes punishment for an offense against the state as compared to a wrong against an individual. Id. (quotation marks and citations omitted).  "[S]anctions for essentially public wrongs are penal in nature." Id. (citation omitted).

Moving defendants assert that the NJWPL is penal in nature because the statute attempts to remedy a public harm.  In weighing this argument, the court notes that earlier versions of the NJWPL did not include a legislative statement of intent. Rosen v. Smith Barney, Inc., 925 A.2d 32, 37 (N.J. Super. Ct. App. Div. 2007), aff'd, 950 A.2d 205 (N.J. 2008).  The Chapter 212 amendments to the NJWPL in 2019 also did not include any stated purpose. See 2019 NJ Sess. Law Serv. Ch. 212 (Sen. 1790) (West).  But the enactment of the law "leads to the conclusion that the statute was designed to protect employees' wages and to

13

guarantee receipt of the fruits of their labor." See Rosen, 925 A.2d at 37.  Thus, the NJWPL and similar laws have been liberally construed by New Jersey courts in order to "fulfill their humanitarian and remedial purposes." Kas Oriental Rugs, Inc. v. Ellman, 972 A.2d 413, 429 (N.J. Super. Ct. App. Div. 2009) (citation and quotation marks omitted).  The NJWPL plainly seeks to remedy harm to the workers of New Jersey and protect the public.

Statutes may be considered both remedial and penal.  Addiss v. Logan Corp., 128 A.2d 462, 466 (N.J. 1957).  To further support their position that the NJWPL is penal in nature, defendants rely upon Addiss and argue that it controls the outcome of this inquiry.  In Addiss, the Supreme Court of New Jersey determined that a 1950s version of the state's Rent Control Act was governed by the two-year statute of limitations in Section 2A:14-10 because excessive rental charges on an individual "also impugn[ed] the statutory purpose of stabilizing rentals in emergency areas and thus incidentally wrong[ed] the public." Id. at 466.

As for the statute at issue here, if an employer violates the NJWPL, the law permits an employee to "recover in a civil action the full amount of any wages due, [...] plus an amount of liquidated damages equal to not more than 200 percent of the wages lost or of the wages due, together with costs and reasonable [attorneys'] fees[.]" Maia, 313 A.3d at 896 (quoting N.J. STAT. ANN. 34:11-4.10(c)).  The NJWPL specifically calls these extra damages "liquidated

damages," not penalties.  The law recognizes a distinction between liquidated damages and penalties. See e.g. Rosen, 950 A.2d at 207.  Accordingly, the court gives weight to this choice of nomenclature and predicts that New Jersey courts would also.  See Hargrove, 106 A.3d at 456 (evaluating the NJWPL using "the plain language of each provision" with accord to "the ordinary meaning of the words selected by the Legislature.") (citations omitted)).

Returning to the analysis in Addiss, the statutory language of the 1950s-era Rent Control Act provided, in relevant part, that, "[a]ny landlord who shall violate any provision of this act…shall forfeit to his tenant a sum equal to 3 times the amount of any rent received by him from his tenant in excess of the lawful base rental." 128 A.2d at 464 (quoting N.J. STAT. ANN. 2A:42-38 (1956) (expired)).[7] Given the use of the word "forfeit" in the Rent Control Act, and the statutory direction that the landlord forfeits an amount three times the base rent, Addiss applied the two-year statute of limitations from Section 2A:14-10 to actions under this statute.

As indicated above, under New Jersey law, the penal statute of limitations period applies in "[a]ll actions at law brought **for any forfeiture** upon any penal

---

[7] Put another way, the Supreme Court of New Jersey considered a similarly worded version of the law to authorize a "treble forfeiture" from offending landlords based upon the language used by the legislature. Friedman v. Podell, 121 A.2d 17, 18 (N.J. 1956) (discussing N.J. STAT. ANN. 2A:42-38 (1953) (expired)).

15

statute made or to be made…" N.J. STAT. ANN. 2A:14-10 (emphasis added). The Rent Control Act contained the word "forfeit" and Section 2A:14-10 applies to "forfeiture" actions. Unlike the Rent Control Act, however, the NJWPL does not reference forfeiture. The absence of the words "forfeit" and "forfeiture" from this section of the NJWPL is an important consideration.

In <u>Larchmont Farms</u>, the Superior Court, Appellate Division determined that, although the state Pesticide Act was penal in nature, the fines and penalties provided for by statute did not "constitute a forfeiture of property that directly contributed to or originated from the illegal conduct." 628 A.2d at 771. Furthermore, despite noting that the penalties sought by the state in that case were "designed to punish the wrongful behavior and hopefully deter similar conduct in the future," the <u>Larchmont Farms</u> court emphasized that the law was not designed to "confiscate the property used or the proceeds earned therefrom." Under those circumstances, the court applied a ten-year limitations period from a different statutory provision, not the two-year limit imposed by Section 2A:14–10. <u>Id.</u> at 771–72.

As discussed in <u>Larchmont Farms</u>, "[f]orfeiture is used to seize property on the theory that that property somehow helped to further a wrongful act." <u>Id.</u> at 771 Nothing in the Pesticide Act indicated to the court "that the Legislature intended forfeiture to be a form of redress for violations of the Pesticide Act or that it

intended the forfeiture statute of limitations to apply to claims under the act." Id. at 771.  Likewise, in the NJWPL, the statute under consideration here, forfeiture language has not been included by the New Jersey legislature and there is nothing in the law suggesting that New Jersey lawmakers intended for the forfeiture statute of limitations to apply.  Based on the text of the statute, the court predicts that the Supreme Court of New Jersey would not apply Section 2A:14-10 to the NJWPL, nor would they conclude that a two-year limitations period applies to claims asserted pursuant to that statute.

This conclusion does not end the inquiry.  Plaintiffs argue that a six-year statute of limitations applies to NJWPL claims. (Doc. 87 at 7–8; Doc. 88 at 7–8).  New Jersey law supports their position.

In Troise v. Extel Commc'ns, Inc., 784 A.2d 748 (N.J. Super Ct. App. Div. 2001) aff'd, 808 A.2d 96 (N.J. 2002), the Superior Court, Appellate Division faced a similar situation where the New Jersey legislature did not include an express statute of limitations for claims arising out of a worker protection statute, New Jersey's Prevailing Wage Act, N.J. STAT. ANN. §§ 34:11-56.25, et seq.  The court concluded that, in the absence of an express statutory provision, private Prevailing Wage Act claims are subject to the six-year limitations period provided in N.J. STAT. ANN. 2A:14-1 ("Section 2A:14-1").  Id. at 751.

The Prevailing Wage Act "authorizes an employee who has received less than the prevailing wage to bring a civil action for recovery of any additional wages owed by the employer." Troise, 784 A.2d at 751.  In determining that Section 2A:14-1 applied, Troise followed New Jersey law and looked to the general limitations period governing that category of claim. Id. (citing McGrogan v. Till, 167 N.J. 414, 420–24, 771 A.2d 1187 (2001); Montells v. Haynes, 133 N.J. 282, 291–95, 627 A.2d 654 (1993)).  The court analyzed the nature of the injuries alleged, which, in that case, included receipt of less than the prevailing wage. Id. at 752.  Troise determined that the injury suffered by the plaintiff was purely economic and then applied the general limitations provision from New Jersey law governing those categories of claims, i.e., claims for breach of contract and tort claims for economic harm.[8] Id. at 751–52.

---

[8] Section 2A:14-1 provides:

> Every action at law for trespass to real property, for any tortious injury to real or personal property, for taking, detaining, or converting personal property, for replevin of goods or chattels, for any tortious injury to the rights of another not stated in N.J.S.2A:14-2 [regarding a two-year limitations period for torts resulting in personal injury] and N.J.S.2A:14-3 [regarding a one-year limitations period in actions for libel or slander], or for recovery upon a contractual claim or liability, express or implied, not under seal, or upon an account other than one which concerns the trade or merchandise between merchant and merchant, their factors, agents and servants, shall be commenced within six years next after the cause of any such action shall have accrued.

N.J. STAT. ANN. 2A:14-1.

In a recent unpublished opinion, the Appellate Division determined that the "reasoning supporting [its] conclusion in Troise applie[d] with syllogistic precision" to NJWPL claims. Cruz v. Aspen Landscaping Contracting, Inc., No. A-2157-22, 2024 WL 5230483, at *7 (N.J. Super. Ct. App. Div. Dec. 27, 2024).[9]  In Cruz, the court concluded that NJWPL claims are comparable to claims for breach of contract or for economic tort claims just like Prevailing Wage Act claims. Id. Thus, it supplied the six-year limitations period from Section 2A:14-1 to NJWPL claims. Id.

There is no indication that the Supreme Court of New Jersey would diverge from the analyses in Troise and Cruz if it ever properly presented with this issue.  The alleged harm to plaintiffs here, nonpayment of wages, is purely economic in nature and was alleged to have been caused, at least in part, by the agreements between the parties.  Consequently, the court predicts that the Supreme Court of New Jersey would apply the six-year limitations period from

---

[9] Such reasoning is in accordance with most federal district courts, which have considered the same issue. Meyers v. Heffernan, 740 F. Supp. 2d 637, 643–45 (D. Del. 2010); see also Derieux v. FedEx Ground Package Sys., Inc., No. CV2113645NLHEAP, 2023 WL 349495, at *3 (D.N.J. Jan. 20, 2023); Meyers v. Heffernan, No. CIV.A. 12-2434 MLC, 2014 WL 3343803, at *8 (D.N.J. July 8, 2014).  There is a recent outlier decision, however. See Bosco v. Compass Grp. USA, Inc., No. 22-CV-6909 (JXN)(JRA), 2025 WL 1742657 (D.N.J. June 23, 2025). In Bosco, the Honorable Julien Neals determined that a two-year limitations period precluded the plaintiffs' NJWPL claims. 2025 WL 1742657, at *5.  Bosco, however, did not expressly hold that the NJWPL was penal in nature or that it included civil forfeiture as a penalty.  Bosco also did not determine that Section 2A:14-10 applied to the NJPWL.  Rather, the plaintiffs in Bosco "seemingly conced[ed]" the defendants' position regarding the two-year limitations period. Id.  Plaintiffs do not make those same concessions here.

Section 2A:14-1 to NJWPL claims. Accordingly, plaintiffs' NJWPL claims will not be dismissed on statute of limitations grounds.

### 2. Preemption

As indicated above, plaintiffs executed agreements to lease their equipment to Defendant Evans, a motor carrier, and provide truck driving services.[10] (Docs. 84-1, 84-2 ¶ 1). These agreements reference federal Truth-in-Leasing ("TIL") regulations, which are part of the Federal Motor Carrier Safety Regulations. See 49 C.F.R. §§ 376.1–376.26. Lease agreements between owner-operators and motor carriers are governed by these regulations. Specifically, TIL regulations require that the lease be in writing and contain specific provisions. Mervyn, 882 F.3d at 682 (citing 49 C.F.R. § 376.11; 49 C.F.R. § 376.12). Consequently, based on the TIL regulations, defendants argue that plaintiffs' NJWPL claims are preempted by federal authority.[11]

---

[10] "The Motor Carrier Act authorizes the Department of Transportation to regulate 'carriers,' including trucking companies, which transport goods interstate. 49 U.S.C. § 14104(a). Often carriers contract with 'hauling agents' to transport the goods. In turn, the hauling agent may contract with an individual truck owner, an 'owner-operator,' who leases his truck and services to the agent and carrier." Mervyn v. Atlas Van Lines, Inc., 882 F.3d 680, 681–82 (7th Cir. 2018).

[11] Procedurally, preemption is an affirmative defense on which the defendant bears the burden of proof. In re Asbestos Prods. Liab. Litig. (No. VI), 822 F.3d 125, 133, n. 6 (3d Cir. 2016) (citation omitted). "This allocation of the burden of proof suggests that a motion under Rule 12(c) for judgment on the pleadings is a more appropriate procedural vehicle for dismissing cases on preemption grounds, instead of a motion under Rule 12(b)(6), except for cases in which preemption is manifest in the complaint itself." Id. Based on reference to the owner-operator agreements in the third amended complaint and the inclusion and reference to these

Preemption stems from the Supremacy Clause of the United States Constitution, U.S. CONST. ART. VI, cl. 2. The Supremacy Clause "invalidates state law that 'interferes with or is contrary to federal law.' " Farina v. Nokia Inc., 625 F.3d 97, 115 (3d Cir. 2010) (quoting Free v. Bland, 369 U.S. 663, 666 (1962) (further citation omitted). Preemption can apply to all forms of state law, including civil actions based on state law, and federal regulations preempt state laws in the same fashion as congressional statutes. Id. (citations omitted).

Defendant Evans asserts that the doctrine of obstacle preemption applies to this matter.[12] "Under obstacle preemption, when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law, that rises to the level of a conflict for which preemption may be implied." Transcon. Gas Pipe Line Co., LLC v. Pennsylvania Env't Hearing Bd., 108 F.4th 144, 158 (3d Cir.), amended on denial of reh'g, 110 F.4th 612 (3d Cir. 2024) (cleaned up).

Here, plaintiffs allege that defendants violated NJWPL by unlawfully requiring them to pay certain expenses and by deducting funds from the plaintiffs' wages to cover those expenses. (Doc. 81, Third Am. Compl. ¶¶ 34a–34n). In

---

documents by the parties in briefing the defendants' motions to dismiss, the court will entertain Defendant Evans's preemption arguments.

[12] Defendant Metal joins in Defendant Evans's preemption arguments. (Doc. 86, Br. in Supp. at 16).

moving to dismiss, Defendant Evans argues that TIL regulations authorized the parties to contractually allocate operational costs to drivers, such as those associated with fuel, taxes, permits, tolls, licenses, and insurance. (Doc. 84, Br. in Supp at 9 (citing 49 C.F.R. §§ 376.12(e), 376.12(j)).  Defendant Evans also argues that the TIL regulations permitted Evans to deduct such costs from the drivers' paychecks, as well as costs related to the purchase or lease of vehicles. Id. (citing 49 C.F.R. §§ 376.12(h)–(j)).  Thus, per Defendant Evans, a decision allowing the NJWPL to prohibit this arrangement would stand as an obstacle to the TIL regulations, which allow for such an arrangement. Id. at 12.

The court disagrees.  "While the TIL regulations certainly contemplate the possibility that a carrier…might contractually allocate certain business-related expenses to owner-operators, they do not indicate that certain agreements and deductions are always valid." Kolev v. Nat'l Freight, Inc., No. 21-CV-15107, 2023 WL 3033572, at *6 (D.N.J. Apr. 20, 2023) (citing Portillo v. Nat'l Freight, Inc., 606 F. Supp. 3d 72, 100 (D.N.J. 2022)).

Moreover, upon review of the provisions cited by Defendant Evans, these regulations only require that "[t]he lease…clearly specify the responsibility of each party with respect to the cost of fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessory services, base plates and

licenses, and any unused portions of such items." 49 C.F.R. § 376.12(e).

Similarly, for insurance, TIL regulations only require that:

> The lease…clearly specify the legal obligation of the authorized carrier to maintain insurance coverage for the protection of the public pursuant to [Federal Motor Carrier Safety Administration] regulations under 49 U.S.C. 13906.

> The lease shall further specify who is responsible for providing any other insurance coverage for the operation of the leased equipment, such as bobtail insurance. If the authorized carrier will make a charge back to the lessor for any of this insurance, the lease shall specify the amount which will be charged-back to the lessor.

49 C.F.R. § 376.12(j)(1) (formatting modified).

Regarding other chargeback items, "[t]he lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed." 49 C.F.R. § 376.12(h). Moreover, regarding obtaining products, equipment, or services from the federally authorized motor carrier:

> The lease shall specify that the lessor is not required to purchase or rent any products, equipment, or services from the authorized carrier as a condition of entering into the lease arrangement. The lease shall specify the terms of any agreement in which the lessor is a party to an equipment purchase or rental contract which gives the authorized carrier the right to make deductions from the lessor's compensation for purchase or rental payments.

49 C.F.R. § 376.12(i).

Other TIL regulations merit consideration here.  Specifically, TIL regulations require "that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease… [and] shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1).  Another regulation regarding exclusive possession indicates that this provision is not "intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee." 49 C.F.R. § 376.12(c)(4).  Other courts have thus concluded that the TIL regulations "were not meant to preempt the protections afforded to employees[,]" under state law.  Goyal v. CSX Intermodal Terminals, Inc., Civ. A. No. 17-06081, 2018 WL 4649829, at *3 (N.D. Cal. Sep. 25, 2018); see also Mejias v. Goya Foods, Inc., No. 220CV12365BRMLDW, 2022 WL 500412, at *4 (D.N.J. Feb. 18, 2022).

Accordingly, there is no indication that the NJWPL is an obstacle to the accomplishment of these administrative regulations.  By improperly withholding funds from truck drivers subject to a lease agreement, a motor carrier can violate the NJWPL while also complying with TIL regulations regarding lease disclosures and the specificity of leases.  See Portillo, 606 F. Supp. 3d at 101; Kolev, 2023

WL 3033572, at *6.  Consequently, defendants' obstacle preemption arguments are rejected.

### 3.  Plausibility of Plaintiffs' NJWPL Claims

Defendants next argue that the third amended complaint fails to set forth plausible allegations that the deductions taken by the defendants were from the plaintiffs' "wages" as that term is defined by New Jersey law.

The NJWPL defines "wages" as "the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto." N.J. STAT. ANN. 34:11-4.1(c).  "Employee," according to the statute, "means any person suffered or permitted to work by an employer, except that independent contractors and subcontractors shall not be considered employees." N.J. STAT. ANN. 34:11-4.1(b).

Plaintiffs' allegations are assumed to be true at this posture. <u>Phillips</u>, 515 F.3d at 233.  The third amended complaint alleges that the plaintiffs drove trucks and made deliveries according to assignments arranged and monitored by the defendants. (Doc. 81 ¶ 18).  Plaintiffs aver that they used trucks obtained through a program facilitated by Defendant Evans, and, in Guimaraes's case, in a replacement vehicle provided by Evans. <u>Id.</u> ¶¶ 26–27, 29–30.  The third

amended complaint also contains various factual allegations to support the plaintiffs' position that they worked as defendants' employees and not as independent contractors. Id. ¶¶ 1, 9, 12, 17–18, 21–23, 26–29. Furthermore, plaintiffs assert that they were paid wages from which the defendants took allegedly unlawful deductions. Id. at ¶¶ 30, 34. Thus, the plaintiffs state plausible claims for violation of the NJWPL.

The court will briefly address defendants' other arguments. Defendant Evans contends that the allegations about "wages" in the third amended complaint fail to differentiate between the compensation plaintiffs received for driving tractor-trailers from the compensation they received for leasing the tractors to Evans. (Doc. 84, Br. in Supp. at 6). Evans asserts that the owner-operator plaintiffs cannot simply deem a source of funds as "wages" when they admit that those funds included lease payments, (id. at 7), while Defendant Metal contends that the plaintiffs failed to allege that this source of funds meets the legal definition of the term. (Doc. 86, Br. in Supp. at 14).

These arguments are unpersuasive. Any inability of the plaintiffs to differentiate in the description of their compensation comes from the nature of the agreements. Per their terms, compensation rates are set forth at a separate schedule, which constitutes "the total compensation for everything furnished, provided, or done by [plaintiffs] related to, arising from and/or in connection with"

the agreement. (Docs. 84-1, 84-2). The relevant schedule indicates that the plaintiffs were compensated using a percentage of revenue from loads with various items charged back and deducted from that compensation, which are the subject of this litigation. (Docs. 87-1, 87-2). The owner-operator agreements do not distinguish different types of compensation; thus, plaintiff's third amended complaint need not do so.

Furthermore, "contractual language cannot override the statutory definition of wages or the remedial purpose of the NJWPL[,] " and the NJWPL "does not authorize employers to redefine or apportion employee compensation in a way that permits deductions otherwise expressly prohibited by the statute." Portillo v. Nat'l Freight, Inc., No. CV 15-07908 (CPO), --- F. Supp. 3d ----, 2025 WL 1298347, at *5 (D.N.J. May 2, 2025). "[T]hat some portion of the gross payment was supposedly contractually labelled to cover truck-related expenses does not transform it into non-wages for purposes of the NJWPL." Id. at *6. Defendants' motions to dismiss plaintiffs' NJWPL claims will thus be denied.

**4. Sufficiency of Plaintiff Duran's NJWHL Overtime Allegations**

Plaintiff Duran asserts a claim under the NJWHL for unpaid overtime on behalf of himself and the putative class. Duran's averments in the third amended complaint are straightforward, this is, he alleges that: 1) the NJWHL required defendants to compensate individuals like Duran with an overtime rate of pay

when they worked more than forty (40) hours per week; 2) Duran and the other putative class members worked well over that amount at the instruction of the defendants; and 3) defendants never compensated Duran and others with an overtime rate of pay. (Doc. 81, Third Am. Compl. ¶¶ 35–37; <u>see also</u> ¶¶ 52–54).

In moving to dismiss Duran's NJWHL claims, defendants argue that Duran's allegations regarding overtime are asserted in a general, conclusory manner and fail to allege what he was actually paid versus what he contends he should have been paid.  Defendants essentially contend that Duran must plead, in detail, each week in which he worked more than forty (40) hours and was not paid an overtime rate.   Duran responds by indicating that he does not have access to records showing the number of hours he worked each week.

Federal pleading standards only require that the third amended complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" FED. R. CIV. P. 8(a)(2).   On a motion to dismiss, the court measures whether claims are plausible. Plausible claims exist somewhere between possible claims and probable claims, that is, "[t]he facts pled must be more than 'merely consistent with a defendant's liability[,]' "... but, at the same time, "the court need only be able to draw a 'reasonable inference' that the defendant has violated the law." <u>See</u> <u>Martinez v. UPMC Susquehanna</u>, 986 F.3d

261, 265 (3d Cir. 2021) (quoting Iqbal, 556 U.S. at 678; Twombly, 550 U.S.at

557) (internal quotation marks omitted).

After careful consideration, the defendants' motions to dismiss Duran's

NJWHL claim will be denied.  Under New Jersey law, every trucking industry

employer must pay truck drivers like Duran an overtime rate of not less than one-

and-a-half (1 ½) times the state minimum wage. N.J. STAT. ANN. 34:11-56A4(f).

The Federal Motor Carrier Safety Regulations govern the maximum hours of

service a truck driver can perform in each workweek. 49 C.F.R. § 395.3.  A truck

driver can be on duty for up to sixty (60) hours in a seven-day period or seventy

(70) hours in an eight-day period. 49 C.F.R. § 395.3(c).  Truck drivers are

required by the regulations to record their duty status, 49 C.F.R. § 395.8, and the

regulations contemplate the use of electronic logging devices, 49 C.F.R. §§

395.20–395.38.  Per his allegations, Duran was required to use electronic

logging systems provided by the defendants to log his driving time and work time.

(Doc. 81, Third Am. Compl. ¶ 18n).  In exchange for this work, Duran was

compensated a percentage of freight revenue per load, subject to various

chargebacks and deductions at issue in his NJWPL claim. (Doc. 87-2).

Thus, even without granular detail about hours worked and compensation

received, Duran's NJWHL claims are plausible on their face in light of the hours

that truck drivers are permitted to work each week under federal regulations and

the qualms over wage payment as asserted in this case.  Although Duran's allegations are not fact-heavy, the court is able to draw a reasonable inference that the defendants are liable for the misconduct alleged in the third amended complaint.  Defendants' motions to dismiss Duran's NJWHL claim will thus be denied.[13]

**Conclusion**

For the reasons set forth above, defendants' motions to dismiss plaintiffs' third amended complaint, (Docs. 83, 85), will be denied.  An appropriate order follows.

Date: 7/10/25

JUDGE JULIA K. MUNLEY
United States District Court

---

[13] Duran has also alleged that he stopped working for defendants in 2023. (Doc. 81, Third Am. Compl. ¶ 3).  The court appreciates Duran's arguments that he does not possess the records required to delve into the details of his compensation and the number of hours that he worked each week. Defendant Evans also argues that the NJWHL does not bar its compensation methodology. (Doc. 84, Br. in Supp. at 14–15).  Yet, this argument is supported with a hypothetical about flat rates of pay, which are contrary to the compensation terms in the parties' agreements. Consequently, the best course of action is to permit the parties to engage in discovery on Duran's NJWHL claim and revisit this issue on a motion for summary judgment.